UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
SCOTT J. BRODIE,                    )
                                    )
           Plaintiff,               )
                                    )
      v.                            )   Civil Action No. 10-0544 (PLF)
                                    )
UNITED STATES DEPARTMENT OF HEALTH  )
AND HUMAN SERVICES, *et al.*,       )
                                    )
           Defendants.              )
_____ )

OPINION

In January 2010, an administrative law judge in the Department of Health and Human Services ("HHS") issued a decision in which he found that plaintiff Dr. Scott J. Brodie had committed serious scientific misconduct and should be barred from participating in programs or projects funded by the federal government for seven years. Proceeding under the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*, Dr. Brodie has moved for a preliminary injunction that would stay his debarment pending the ultimate outcome of this action. The Court heard oral argument on the plaintiff's motion on June 3, 2010. After careful consideration of the parties' arguments and the relevant legal standards, the Court will deny the motion for a preliminary injunction.[1]

---

[1] The papers reviewed by the Court include the following: plaintif's complaint ("Compl."); plaintiff's motion for a preliminary injunction ("Mot."); defendant's opposition to the plaintiff's motion ("Opp."); plaintiff's reply to defendant's opposition ("Reply"); Mot., Ex. 1 (Recommended Decision Granting Summary Disposition to the Office of Research Integrity) ("R.D."); and the affidavit of Scott J. Brodie (attached to plaintiff's motion for a preliminary injunction) ("Brodie Affid.").

## I. BACKGROUND

### *A. Debarment Proceedings at HHS*

The Public Health Service ("PHS"), a major division of the Department of Health and Human Services, provides grants and other support "for biomedical [and] behavioral research," training, and "activities related to that research or research training." 42 C.F.R. § 93.100(b) (2009). HHS regulations provide that "[r]esearch misconduct involving PHS support is contrary to the interests of the PHS and the Federal government and to the health and safety of the public, to the integrity of research, and to the conservation of public funds." Id. § 93.100(a). To facilitate the identification, sanction, and prevention of research misconduct, HHS has promulgated regulations that require institutional recipients of PHS funding to investigate and report allegations of misconduct by their own employees. See generally 42 C.F.R. §§ 93.100-.319 (2009); 42 C.F.R. §§ 50.101-.105 (2004).[2]

Institutions that receive PHS funding are required to report the results of their investigations into alleged misconduct to the Office of Research Integrity ("ORI"), an office within HHS. See 42 C.F.R. §§ 93.313, 93.315 (2009); 42 C.F.R. § 50.104 (2004). ORI may then review the case and make its own independent determination as to whether misconduct occurred. 42 C.F.R. §§ 93.403-.404 (2009). If the office does conclude that a researcher committed misconduct, it notifies the researcher by sending him a "charge letter" in which it describes the

---

[2] HHS considerably expanded its regulations governing institutional monitoring and reporting of internal research misconduct in 2005. See 70 Fed. Reg. 28, 370-400 (May 17, 2005). Because periods of time occurring before and after 2005 are relevant to this case, citations to both the pre- and post-2005 sets of regulations are provided where appropriate. Where a citation to the Code of Federal Regulations does not specify a year of publication, it refers to the 2009 version of the Code.

2

misconduct found and the sanctions proposed, which may consist of "debarment or suspension" — "the Government wide exclusion, whether temporary or for a set term, of a person from eligibility for Federal grants, contracts, and cooperative agreements under the HHS regulations [for procurement and nonprocurement]." Id. §§ 93.205, .405. The researcher may contest the charges of misconduct by requesting a hearing before an administrative law judge ("ALJ"). See 42 C.F.R. §§ 93.501-.523.

Once the ALJ is prepared to render a decision on the merits of the misconduct charges, he must issue a ruling in writing, which "constitutes a recommended decision to the Assistant Secretary for Health." 42 C.F.R. § 93.522. The Assistant Secretary may then, after review of the decision, approve, reject, or modify it. Id. If the Assistant Secretary determines that misconduct was committed and decides to order suspension or debarment as a sanction, his or her decision is transmitted to a "debarring official." Id. That "decision . . . constitute[s] findings of fact [for] the debarring official," who then makes a final decision regarding debarment or suspension. Id. "The decision of the debarring official . . . is the final HHS decision on those administrative actions." Id.

### B. Dr. Brodie's Disbarment Proceedings

From at least 1999 through 2002, Dr. Brodie performed medical and scientific research at the University of Washington ("UW"). Compl. ¶¶ 8-9. In 2002, UW began investigating Dr. Brodie to determine whether he had committed research misconduct between 1999 and 2001. Id. ¶ 9. In 2003, UW issued a report in which it concluded that Dr. Brodie had

3

committed misconduct; the university subsequently notified Dr. Brodie that he was "'banned from future employment at UW.'" Id. ¶ 16.

Although UW apparently concluded its investigation of Dr. Brodie by 2004, several years elapsed before ORI took any action against him. On September 17, 2008, ORI sent him a charge letter, informing him that the agency had determined that he had engaged in research misconduct and intended to debar him from conducting research supported by PHS funds for a period of seven years. Compl. ¶ 17. Dr. Brodie notified ORI that he would contest the decision and requested a hearing. Id. ¶ 18. After an ALJ was assigned to the case, ORI moved to dismiss Dr. Brodie's hearing request. Id. ¶ 27. That motion was granted in part and denied in part. Id. ¶ 29. Specifically, the ALJ determined that Dr. Brodie had raised no triable objections to ORI's charges that he had submitted grant applications, articles, and other documents containing "materially false statements and data"; according to the ALJ, the doctor had certainly done so. Id. The ALJ also concluded, however, that Dr. Brodie had "raised a triable issue concerning his intent in submitting or publishing the documents and presentations containing the false statements and data." Id.

The parties then began to prepare for a hearing on that second issue — Dr. Brodie's *mens rea* with regard to the falsifications contained in documents he had authored. Prior to the hearing date, on November 10, 2009, ORI moved for summary disposition of Dr. Brodie's case, contending that the evidence gathered by the parties supported only one reasonable inference with regard to Dr. Brodie's state of mind: he had "intentionally, knowingly or recklessly submitted or published or caused the submission or publication of the materially false information" contained in the documents he had authored. Compl. ¶¶ 34, 42.

4

The ALJ agreed with ORI. He examined in detail the falsified information contained in Dr. Brodie's documents and concluded that "there are only two reasonable inferences that I can draw from Respondent's systematic publication of false or fabricated information. Either he published information that he knew to be false or fabricated, or he published it with indifference to the truth of its contents. The sheer volume and pattern of false items that [Dr. Brodie] published or attempted to publish lead inescapably to my conclusion that [he] had contempt for the truth." R.D. at 8-9. In support of that conclusion, the ALJ examined in detail numerous instances in which Dr. Brodie had published or submitted for publication documents containing obviously falsified images (often called "figures") or other data. For example, the ALJ found that the evidence showed conclusively that, in a grant application, Dr. Brodie had included a figure purporting to represent tissue from the "lingual tonsil." Id. at 15. Elsewhere in the same application appeared the exact same figure, inverted and with selected data removed. Id. at 15-16. In that instance, the figure was labelled as "rectal mucosa" — an entirely different source of tissue. Id. at 16. The ALJ rejected Dr. Brodie's explanation that this circumstance was merely the product of "error," concluding that the contradictory uses to which the figure was put constituted "such an obvious fabrication that [Dr. Brodie] could only have made it deliberately or used the falsified image with reckless disregard for the truth or falseness of what he published." Id.

The ALJ reached the same conclusion with regard to numerous other similar circumstances: again and again, he pointed out that in one document, Dr. Brodie had labeled a figure in a certain way, while in other documents, he had given the same figure or a slightly altered version of it a contradictory label. See, e.g., R.D. at 13-14 (same image described as

5

representing cells at 97.7 percent purity or cells at 99.7 percent purity); id. at 15 (figure described as "lymphoid tissue from pediatric lung" in one document, but as tissue from "lingual tonsil" in another). Dr. Brodie's defense as to each incident was the same. He claimed that the inconsistent use of the images was accidental, or that someone else had altered/falsified the image in question and given him the description of it, and that he was unaware that the description or depiction of data was inaccurate. See, e.g., id. at 13-16. The ALJ rejected this defense, finding that even if Dr. Brodie had not altered the images or their descriptions himself, he was culpable for their inclusion in his papers because the images were "palpably false." Id. at 18. Given the obvious inconsistencies in the manner in which the images appeared and were described, Dr. Brodie must have known, at the very least, that they *might* have been false. With regard to one figure, for example, the ALJ concluded that he could reach only one conclusion: "Either [Dr. Brodie] personally altered the figure, or he submitted the figure without verifying its truthfulness." Id. at 14.[3]

Ultimately, the ALJ concluded that "[t]he undisputed facts establish this to be an extremely serious case of misconduct" and that Dr. Brodie had "committed research misconduct on a grand scale by publishing or attempting to publish false and fabricated images and information in numerous documents." Id. at 27. In light of those conclusions, the ALJ determined that debarment for seven years was a "reasonable remedy" for Dr. Brodie's misconduct, and he recommended that remedy to the HHS debarring official. Id. at 27.

---

[3] The ALJ also dismissed various other arguments by Dr. Brodie, rejecting his claims that he had been "denied access to relevant information and evidence," that it was unfair for ORI to proceed against him so many years after the UW investigation, and that ORI had failed to "produce testimony from UW investigators." R.D. at 26.

Dr. Brodie initiated this lawsuit on April 2, 2010. On some unknown date, but not later than April 19, 2010, his name was "placed in the General Services Administration's [Excluded Parties List System ("EPLS")] database," in which Dr. Brodie is identified as a person debarred from engaging in any transactions with a federal agency for committing one or more of a variety of forms of misconduct. Mot. at 7 & n.1. Dr. Brodie moved for a preliminary injunction preventing his debarment and requiring the removal of his name from the EPLS database on April 28, 2010. On May 5, 2010, a notice announcing Dr. Brodie's debarment and describing the fifteen specifications of research misconduct adjudicated against him was published in the *Federal Register*. 75 Fed. Reg. 24,703, 24,703-704 (May 5, 2010).

## II. DISCUSSION

A preliminary injunction is "an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004)) (internal quotation marks omitted). To warrant preliminary injunctive relief, the moving party must show: (1) that there is a substantial likelihood that he will succeed on the merits of his claim, (2) that he will suffer irreparable injury in the absence of an injunction, (3) that an injunction would not substantially harm the defendants or other interested parties (balance of harms), and (4) that the public interest would be furthered, or at least not adversely affected, by the injunction. See id.; Davis v. Pension Benefit Guar. Corp., 571 F.3d 1288, 1291 (D.C. Cir. 2009); Serono Labs., Inc. v. Shalala, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998).

The plaintiff is not required to prevail on each of these factors. Rather, these factors must be viewed as a continuum, with more of one factor compensating for less of another. Davis v. Pension Benefit Guar. Corp., 571 F.3d at 1291-92. "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 747 (D.C. Cir. 1995). An injunction may be justified "where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." Id. Conversely, when the other three factors strongly favor interim relief, a court may grant injunctive relief when the moving party has merely made out a "substantial" case on the merits. The necessary level or degree of likelihood of success that must be shown will vary according to the Court's assessment of the other factors. Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843-45 (D.C. Cir. 1977). An injunction may be issued "with either a high probability of success and some injury, or vice versa." Cuomo v. U.S. Nuclear Regulatory Comm'n, 772 F.2d 972, 974 (D.C. Cir. 1985).

Despite this flexibility, however, "a movant must demonstrate at least some injury for a preliminary injunction to issue," and "a failure to show *any* irreparable harm" constitutes grounds for denying the motion for a preliminary injunction, "even if the other three factors entering the calculus merit such relief." Chaplaincy of Full Gospel Churches v. England, 454 F.3d at 297 (quoting CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 747 (D.C. Cir. 1995) (internal quotation marks omitted), and citing Sea Containers Ltd. v. Stena AB, 890 F.2d 1205, 1210-11 (D.C. Cir. 1989)) (emphasis added).

## A. The Merits

Dr. Brodie argues that HHS' debarment of him was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the APA, 5 U.S.C. § 706(2)(A), because (1) "[t]he ALJ denied [him] an opportunity for a hearing," Mot. at 8; (2) "the ALJ granted summary disposition to ORI, even after finding triable issues of material fact," id. at 10; and (3) "the ALJ applied the wrong standard for research misconduct." Id. at 12.[4] Although the third of those arguments may prove in time to have merit, at this point in these proceedings the plaintiff has failed to convince the Court that there is a substantial likelihood that he will prevail on the merits of his claims.

### 1. Opportunity for a Hearing

Dr. Brodie argues that by deciding his case by summary disposition before the parties could present evidence at an oral hearing, the ALJ deprived him of his Fifth Amendment due process rights. Mot. at 8-9. In support of this assertion, he cites cases that require the government to afford contractors or other entities subject to suspension or debarment notice and a hearing — in other words, the standard ingredients of due process. See, e.g., Commercial Drapery Contractors, Inc. v. United States, 133 F.3d 1, 6 (D.C. Cir. 1998) ("Suspending a contractor is a serious matter . . . An agency may not impose even a temporary suspension without providing the 'core requirements' of due process: adequate notice and a meaningful hearing."). He also suggests that the ALJ violated HHS' own regulations in granting summary

---

[4] At oral argument, plaintiff's counsel, responding to questioning from the Court, also contended that the ALJ had failed to consider mitigating factors sufficiently when approving a seven-year period of debarment for Dr. Brodie. Because this issue was not raised by the plaintiff in his motion for a preliminary injunction, the Court will not consider it in this Opinion.

disposition in advance of an in-person hearing, pointing out that under HHS rules, "'the ALJ must grant a respondent['s] hearing request if the ALJ determines that there is a genuine dispute over facts material to the findings of research misconduct.'" Mot. at 10 (quoting 42 C.F.R. § 93.503).

These arguments are unconvincing in light of another HHS regulation that expressly provides for summary disposition where there are no genuine factual disputes and in light of the ALJ's explicit finding that there was no "genuine dispute over facts material to the findings of research misconduct" in Dr. Brodie's case. See R.D. at 6 ("Summary disposition is appropriate in this case because the undisputed material facts establish that Respondent knowingly and intentionally published or attempted to publish information that was false or fabricated and which was material to the research he published or attempted to publish."). HHS regulations specifically provide that an ALJ may dispose of a case summarily without any in-person hearing "where there is no disputed issue of material fact." See 42 U.S.C. § 93.506(b)(15). The grant of summary disposition in the absence of disputed issues of material fact also comports with constitutional due process: "[I]f the hearing mandated by the Due Process Clause is to serve any useful purpose, there must be some factual dispute between [the parties]." Codd v. Velger, 429 U.S. 624, 627 (1977); see also 2 RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 8.3 (4th ed. 2002) ("Even when an agency is required by statute or by the Constitution to provide an oral evidentiary hearing, it need do so only if there exists a dispute concerning a material fact."). In light of these factors, the Court cannot conclude that Dr. Brodie was deprived of any process to which he was due.

2. Triable Issues of Material Fact

Dr. Brodie argues that the ALJ erred in finding Dr. Brodie responsible for misconduct without "first determining whether . . . the record creates a genuine issue of material fact." Mot. at 11. That claim is simply inaccurate. The ALJ specifically found that there was no disputed issue of material fact in Dr. Brodie's case at the summary disposition stage. See R.D. at 6. He determined that even if he assumed the truth of Dr. Brodie's unsupported assertions that other people had altered and/or mislabeled the inaccurate figures found in his work, the record nevertheless supported only one reasonable inference regarding Dr. Brodie's state of mind: Dr. Brodie had been either knowing or reckless with regard to the falsification of information. See, e.g., id. at 9.

Dr. Brodie argues that the ALJ's finding at the summary disposition stage that there were no genuine issues of material fact contradicted the ALJ's finding at the motion to dismiss stage that there was a triable question of fact with respect to Dr. Brodie's state of mind. Mot. at 11. But the ALJ's decision at the motion to dismiss stage was based on the allegations made in Dr. Brodie's response to the ORI's charge letter. See R.D. at 2. His decision regarding the motion for summary disposition was based on the evidence subsequently submitted by the parties to support their claims. Id. at 2, 6. The ALJ found that Dr. Brodie had failed to offer any specific facts or evidence at the summary disposition stage that would support his claims of blamelessness or counter ORI's evidence. Id. at 6. He concluded that the "facts and arguments offered by [Dr. Brodie] [were] irrelevant or simply incorrect," while the contentions of ORI were persuasive and well supported by the evidence. Id. Thus, there is no contradiction between the ALJ's rulings at the motion to dismiss stage and the summary judgment stage, just as a trial court

11

does not rule inconsistently when it grants a motion for summary judgment after earlier denying a motion to dismiss for failure to state a claim.

### 3. Definition of Misconduct

Finally, Dr. Brodie asserts that the ALJ's ruling was arbitrary, capricious, or not in accordance with law because the ALJ applied the wrong standard of misconduct to Dr. Brodie's actions. See Mot. at 12. From 1989 through 2005, HHS regulations contained the following description of misconduct:

> Misconduct or Misconduct in Science means fabrication, falsification, plagiarism, or other practices that seriously deviate from those that are commonly accepted within the scientific community for proposing, conducting, or reporting research. It does not include honest error or honest differences in interpretations or judgments of data.

42 C.F.R. § 50.102 (Oct. 1, 2003).

In 2004, HHS announced in the *Federal Register* that it was proposing amendments to its existing rules in order to, among other things, "expand" the "level of intent" associated with research misconduct "beyond an intentional and knowing standard to include recklessness." 69 Fed. Reg. 20, 778, 20,780 (Apr. 16, 2004). Accordingly, HHS in 2005 promulgated a final rule that refined the definition of "misconduct" as follows:

> Research misconduct means fabrication, falsification, or plagiarism in proposing, performing, or reviewing research, or in reporting research results.
>
> (a) Fabrication is making up data or results and recording or reporting them.
>
> (b) Falsification is manipulating research materials, equipment, or processes, or changing or omitting data or results such that the

12

> research is not accurately represented in the research record.
>
> (c) Plagiarism is the appropriation of another person's ideas, processes, results, or words without giving appropriate credit.
>
> (d) Research misconduct does not include honest error or differences of opinion.
>
> . . .
>
> A finding of research misconduct made under this part requires that —
>
> (a) There be a significant depature from accepted practices of the relevant research community; and
>
> (b) The misconduct be committed intentionally, knowingly, or recklessly; and
>
> (c) The allegation be proven by a preponderance of the evidence.

42 C.F.R. §§ 93.103-.104. At the same time that HHS published the amended final rule in 2005, the agency stated that while the procedures described in the new rule would be applied in all cases going forward, "the definition of research misconduct that was in effect at the time the misconduct occurred would apply" in pending cases. 70 Fed. Reg. 28, 380 (May 17, 2005). Thus, the parties in this case agree that the pre-2005 definition of misconduct applies in Dr. Brodie's case. See Mot. at 12; Opp. at 21.

Dr. Brodie contends that the ALJ did not use the pre-2005 definition in his case, but rather applied the amended rule. See Mot. at 13. That argument is unconvincing. The ALJ explicitly noted that he was to apply the pre-2005 definition and concluded that Dr. Brodie's conduct fell within that definition. See R.D. at 8. Dr. Brodie's more substantive argument is that the ALJ impermissibly expanded the meaning of the pre-2005 definition to permit a finding of

13

misconduct where the falsification at issue was committed recklessly, as opposed to knowingly or intentionally. See Mot. at 13. At this preliminary stage in these proceedings, however, Dr. Brodie has failed to demonstrate a likelihood of success on this claim for at least two reasons.

First, it is far from clear that the pre-2005 rule excluded from its definition of misconduct falsification that was not knowing or intentional. The text of the rule, after all, makes no mention of a particular state of mind and, at least on its face, encompasses *all* falsification and fabrication except "honest error or honest differences in interpretations or judgments of data." 42 C.F.R. § 50.102 (2004). The ALJ concluded that Dr. Brodie had submitted falsified accounts of his research with either the specific knowledge that the accounts were false or with indifference as to whether they were false. See, e.g., R.D. at 8. False data submitted with indifference as to its truth could, on a reasonable reading of the pre-2005 rule, easily fall within the definition of "misconduct" because such an act of falsification would not seem to be the product of an "honest error" or honest difference in judgment. The person committing the falsification, after all, must have consciously ignored a substantial risk of inaccuracy.

In support of his argument that the pre-2005 rule reaches only a narrow band of knowing or intentional falsification, Dr. Brodie makes only one rather weak argument: he says that HHS' commentary in the 2004 *Federal Register* regarding the scope of the pre-2005 definition of misconduct is "evidence of HHS policy to *not* consider a finding of recklessness [sufficient] to establish 'research misconduct' under the" unamended regulation. Mot. at 13-14 (emphasis in original). But plaintiff's counsel has not even attempted to explain why passing commentary in the *Federal Register* published roughly fifteen years after the promulgation of the

14

pre-2005 rule — perhaps the equivalent of administrative dicta? — should trump the considered interpretation of the rule issued by an HHS administrative law judge.

Second, even if the pre-2005 rule did reach only knowing and intentional conduct, the plaintiff has not yet persuaded the Court that the administrative law judge failed to apply that standard. In granting summary disposition in favor of ORI, the ALJ claimed to find that "the undisputed material facts establish that [Dr. Brodie] *knowingly and intentionally* published or attempted to publish information that was false or fabricated . . . ." R.D. at 6 (emphasis added). The ALJ also spent considerable time exploring the pre-2005 definition of misconduct. He cited the text of the definition and then declared: "On its face the regulation separates willful misconduct from simple negligence or honest error. However, it does not describe in detail what would comprise willful misconduct." R.D. at 8. Examining a prior administrative decision interpreting the definition, see Dr. Rameshwar K. Sharma, Dec. No. 1431, 1993 WL 742551 (HHS Dept. App. Bd. Aug. 6, 1993), the ALJ stated that in that case, the administrative decisionmaker "drew a distinction between honest error and statements that are made with the knowledge that they would mislead the reader. The latter type of statement, as opposed to mere negligence, constituted misconduct." Id. He then stated:

> I conclude that "intentionally" publishing false or fabricated information subsumes both the circumstance where the scientist publishes information that he or she knows is false and the circumstance where the scientist publishes information with indifference to its truth. The scientist who publishes with indifference to the truth of what he or she publishes knows that the published information could mislead the reader, and so, such conduct is research misconduct.

R.D. at 8.

As the defendants have pointed out, the meaning of "knowingly" and "intentionally" delineated by the ALJ is not unfamiliar to the courts. The ALJ's description of "[t]he scientist who publishes with indifference to the truth of what he or she publishes" may correspond to a *mens rea* of extreme recklessness, which sometimes constitutes "a state of mind closer to conscious intent than to gross negligence." Howard v. SEC, 376 F.3d 1136, 1143 n.10 (D.C. Cir. 2004); see also A.E. Staley Mfg. Co. v. Sec'y of Labor, 295 F.3d 1341, 1351 (D.C. Cir. 2002) (noting that "[t]he use of a state of mind like plain indifference as a substitute for knowledge of a specific condition is well recognized" in various legal contexts). The plaintiff has not even addressed the possibility that the level of extreme indifference identified by the ALJ may be equivalent in nature to intent or knowledge, broadly defined.

The Court stresses that none of the above reasoning reflects a definitive ruling regarding the meaning of the ALJ's decision or the pre-2005 rule. This reasoning does, however, indicate that plaintiff has not yet demonstrated a likelihood of success on the merits — let alone a substantial likelihood — sufficient to weigh in favor of the issuance of a preliminary injunction.

*B. Irreparable Harm*

Dr. Brodie claims that his "debarment will and has already caused irreparable injury to his reputation[] and his current employment and economic prospects." Mot. at 15. He says that his "livelihood rests exclusively on his contract term of employment with the federal government and he is dependent on that contract for income." Id. Furthermore, he contends that "the stigma of having been placed on the EPLS list as someone who is unworthy of employment

16

with the federal government will likely follow him for the duration of his career." Id. at 16. Dr. Brodie's claims of irreparable harm thus fall into two categories: harm to (1) reputation and (2) career.

Although harm to reputation has been recognized repeatedly as a type of irreparable injury, see, e.g., Alf v. Donley, 666 F.2d 60, 69 (D.D.C. 2009), Dr. Brodie's claimed fear of "stigma" fails to prove irreparable harm in this case because that claim is both vague and unsupported; there is no indication in the record that Dr. Brodie's employer or any particular colleagues are likely to learn of the ALJ's decision in the near future. Merely conclusory allegations of stigma do not suffice to establish imminent injury. See, e.g., Feinerman v. Bernardi, 558 F. Supp. 2d 36, 51 (D.D.C. 2008); Trudeau v. FTC, 384 F. Supp. 2d 281, 297 (D.D.C. 2005). The generalized risk that individuals in the scientific community may learn of the ALJ's findings against Dr. Brodie during the pendency of this matter is not the sort of threat that can be neutralized by court order. A summary of the ALJ's decision appeared in the *Federal Register* on May 5, 2010, and no order of this Court can avert the risk that people in the plaintiff's field may discover that *Federal Register* entry and view him as "someone who is unworthy of employment with the federal government." Mot. at 16.

Dr. Brodie's claims regarding his present employment are potentially more serious, but they are so vague and conclusory that they are difficult to credit. Dr. Brodie avers that his current employer — which has not been identified — "is a lower tier recipient of HHS funding" and says that his "debarment and subsequent publication and notice of the debarment will end [his] current employment" because he is "disqualified from employment with any entity that has a contract with the federal government." Brodie Affid. ¶ 16. That statement is

17

inaccurate. As the defendants point out, "[w]hether [Dr. Brodie's] employer receives government funds for certain projects . . . is a different issue from whether [the plaintiff] works on those government funded projects. His debarment would preclude him from doing the latter, but would not bar him from working for a private company on non-government funded projects." Opp. at 26-27. Dr. Brodie does not claim that his current employment involves working on a federally funded project. There is no evidence that his debarment poses an imminent threat to his ability to fulfill his responsibilities to his employer.

The defendants also note that, in a letter sent to HHS in late March of 2010, Dr. Brodie claimed that "he was 'neither a contractor nor subcontractor with the United States and only tangentially involved in nonprocurement programs.'" Id. at 26 (citing Opp., Ex. D). Dr. Brodie all but concedes that point in his reply memorandum, arguing that "even if [his] current position is only tangentially funded with federal grants, it is still extremely likely that his employer will decide that having an employee with limited mobility to engage in certain tasks is not in the company's best interest." Reply at 12. The Court has no reason to credit that statement, however, as it is unsupported by any specific facts. Indeed, all of Dr. Brodie's claims of professional injury rest only on his conclusory assertions that he is in imminent danger of being fired. He provides no evidentiary support or even specific factual allegations that would support those assertions. As a result, he has not established that irreparable harm is likely in the absence of preliminary injunctive relief.

### 3. Other Factors

The remaining factors to be weighed — the potential effects of the requested injunction on the defendants and the public interest — do not support issuance of an injunction. While each of the parties makes a half-hearted attempt to suggest that the public interest is on their side — plaintiff says that the public interest is served when agencies are forced to follow the law, Mot. at 17-18; defendants say that the public interest is served when research integrity is maintained, Opp. at 30-31 — these are both very abstract kinds of harm and ultimately balance each other out. Because the Court has no reason to believe that Dr. Brodie is currently working on a government-funded project whose integrity he could jeopardize, the defendants do not have a powerful immediate interest in keeping Dr. Brodie's name in the EPLS database or maintaining his debarment. The fact that an injunction would not cause immediate harm to the defendants, however, is not, on its own, sufficient justification for the issuance of the injunction. Where the plaintiff has not shown a substantial probability of success on the merits or the likelihood of irreparable harm, and the public interest is not strongly implicated, this Court will not issue a preliminary injunction.

## III. CONCLUSION

For the foregoing reasons, the plaintiff's motion for a preliminary injunction will be denied. The parties shall propose to the Court a schedule for the expedited briefing of dispositive motions. An Order consistent with this Opinion shall issue this same day.

SO ORDERED.

/s/_____
PAUL L. FRIEDMAN
United States District Court

DATE: June 4, 2010